**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL G. ROWE and<br>LAB RAT PRODUCTIONS, INC.,<br><br>*Plaintiffs*,<br><br>v.<br><br>DISCOVERY COMMUNICATIONS, LLC and<br>DISCOVERY TALENT SERVICES, LLC,<br><br>*Defendants.* | Case No.<br><br><br><br><br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Michael G. Rowe ("Rowe") and Lab Rat Productions, Inc. ("Lab Rat"), for their Complaint ("Complaint") against Discovery Communications, LLC ("DCL") and Discovery Talent Services, LLC ("Discovery Talent", and collectively with DCL, "Discovery"), allege as follows:

## I.    BACKGROUND

1.      Plaintiff Rowe is the creator and host of a popular television show, *Dirty Jobs*. This Complaint is brought to resolve a dispute between Rowe and Discovery over how Rowe is compensated for airings of *Dirty Jobs* on Discovery and on third-party platforms.

2.      According to Discovery's own press releases, the November 16, 2010, premiere episode of *Dirty Jobs* was the number one non-fiction cable program among males ages 25-54 (excluding news) and the number one non-fiction cable program in prime-time among males ages 18-49 category (excluding sports). The success of *Dirty Jobs* helped make the flagship Discovery Channel one of the top-rated cable networks in prime-time. As a testament to the series' evergreen nature and enduring popularity, Discovery aired over 5,000 episodes of *Dirty Jobs* between 2005

and 2020. In fact, years after the original series ended in 2012, *Dirty Jobs* continues to be highly popular, airing an average of approximately 335 times per year between 2014 and 2023.

3.      Rowe's extraordinary contribution to Discovery's success enabled him to negotiate agreements in 2008 and 2011 ("Prior Agreements") that accorded him unusual controls and performance-based compensation provisions. By way of example, under the Prior Agreements, he negotiated for and obtained (i) a royalty/ratings bonus for linear airings of *Dirty Jobs* on a network owned and/or operated by DCL, (ii) joint control over certain areas of distribution of his work product, and (iii) the right to share in profits from various third-party deals.

4.      In 2015, Rowe conducted an audit relating to payments under the Prior Agreements that led to several mediation sessions to resolve the parties' disputes.

5.      Ultimately, in 2020, they resolved their disputes. Discovery Talent and Lab Rat entered a new Participation Agreement dated January 1, 2020, governing *Dirty Jobs* going forward (the "Agreement", cited herein as "Agr.").

6.      Rowe negotiated for, and obtained, significant concessions in the Agreement designed to ensure that he would be fairly compensated for *Dirty Jobs* airings both on Discovery and on third-party platforms. These included (i) a royalty/ratings bonus for linear airings of *Dirty Jobs* on a network owned and/or operated by DCL, (ii) compensation for airing on Discovery's direct-to-consumer platforms, (iii) Joint Control (as defined in the Agreement) over certain forms of distribution of his work product, and (iv) the right to share in profits from various third-party deals, including video on demand rights involving third-party platforms.

7.      But since entering the Agreement, Discovery Talent has disregarded and breached its obligations under the Agreement.

## II.    PARTIES

8.    Plaintiff Rowe is an individual who resides in California. Rowe is a well-known television host, writer, narrator, producer, actor, and commercial spokesperson. Rowe provides his services in the entertainment industry through his loan-out corporation, Lab Rat.

9.    Plaintiff Lab Rat is a corporation organized under the laws of the State of California, with its principal place of business in Santa Monica, California.

10.    Defendant DCL is an entertainment conglomerate organized as a limited liability company under the laws of the State of Delaware, is registered to do business in the State of New York, and has its principal place of business in Silver Spring, Maryland. DCL operates numerous cable networks worldwide, including Animal Planet, TLC, Destination America, Discovery en Español, and its flagship station Discovery Channel.

11.    DCL's sole member is Discovery Communications Holding, LLC, a Delaware limited liability company. Discovery Communications Holding, LLC's members are DHC Discovery, Inc., a Colorado corporation with its principal offices in New York, New York, and Warner Bros. Discovery, Inc., a Delaware corporation with its principal offices in New York, New York.

12.    Defendant Discovery Talent is a limited liability company organized under the laws of the State of Delaware, with its principal place of business is in Silver Spring, Maryland. Discovery Talent is the entity through which DCL contracted with Rowe through Lab Rat. DCL is the guarantor of Discovery Talent's obligations under the Agreement.

13.    Discovery Talent's sole member is Warner Bros. Discovery, Inc., a Delaware corporation with its main offices in New York, New York.

### III.    JURISDICTION AND VENUE

14.    Plaintiffs are citizens of the State of California for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

15.    Defendants are citizens of the States of Colorado, Delaware, and Maryland for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

16.    This Court has original subject matter jurisdiction with respect to this action pursuant to 28 U.S.C. § 1332 as there exists complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

17.    Venue is proper in the Southern District of New York because the parties' dispute arises out of their Agreement and Guaranty, pursuant to which each party agreed to exclusive jurisdiction and venue of such disputes in the federal and state courts in New York, New York and waived any objection to personal jurisdiction of such courts.

18.    Specifically, in Section 48 of the Agreement, the parties thereto agreed as follows:

> The parties agree that the courts in New York County, New York shall have exclusive jurisdiction to resolve any claim, dispute or matter arising out of, relating to or in connection with this Agreement including any dispute as to its existence, validity, interpretation, performance, breach or termination and any dispute relating to any non-contractual obligations arising out of or in connection with it. Each party submits to the exclusive jurisdiction of the courts in New York County, New York and irrevocably waives any objection to such courts on the grounds that they are an inconvenient or inappropriate forum.

19.    In addition, in Section 10 of the DCL Guarantee, the parties thereto agreed as follows:

> The parties agree that the courts in New York County, New York shall have exclusive jurisdiction to resolve any claim, dispute or matter arising out of, relating to or in connection with this guarantee, including any dispute as to its existence, validity, interpretation, performance, breach or termination. Each party submits to the exclusive jurisdiction of the courts in New York

4

County, New York and irrevocably waives any objection to such courts on the grounds that they are an inconvenient or inappropriate forum.

20.     As set forth in the Agreement and the DCL Guarantee, they "shall be governed by and construed in accordance with the laws of the State of New York." Agr., at § 48; DCL Guarantee, at § 10.

## IV.    NATURE OF DISPUTE

21.     Discovery Talent's breaches principally involve three sections of the Agreement, Sections 16, 17, and 22.

22.     Section 16 governs Lab Rat's right to a fixed ratings royalty for any episode of the Program that airs as a linear service on a network owned and/or operated by DCL in the United States and is defined in the Agreement as a DCL Linear Service. The base royalty rate during the period in dispute has been $2,000 per airing. Under Section 16, a DCL Linear Service must be "linear" and "not video on demand," and DCL must control "all the programming decisions" including "the scheduling of the programming that composes the network's linear feeds."

23.     Section 17 governs Lab Rat's right to a royalty in connection with the exploitation of any episode of *Dirty Jobs* on a video-on-demand basis in the United States on a Discovery Internet-delivered platform, defined in the Agreement as a "DCL Digital Platform." A DCL Digital Platform must be a "video-on-demand, direct-to-consumer service owned and operated by DCL" and such a platform "shall not include a third-party digital distribution platform operated by a MVPD [Multiprogram Distributor], virtual MVPD or any other third party."

24.     Section 22 governs Lab Rat's right to participate in any airings of *Dirty Jobs* using a third-party platform. Section 22 generally provides Lab Rat with greater compensation for licensing video-on-demand episodes of *Dirty Jobs* through third-party platforms than Lab Rat receives for airings on Discovery's platforms.

5

25.     In addition, any exploitation of *Dirty Jobs* via a third-party Subscription Video on Demand or Advertising Video on Demand in the United States is subject to Lab Rat's Joint Control, and Discovery cannot proceed with such exploitation without Lab Rat's prior written consent, as provided in the Joint Control provisions of Section 21 of the Agreement.

26.     Discovery Talent has breached the Agreement by failing to account for and pay royalties for airings of *Dirty Jobs* and by failing to honor the Joint Control provisions.

27.     Discovery Talent has primarily sought to justify its most significant breaches by taking disingenuous and unsupportable contract interpretations to deny Rowe the compensation he earned and is due. Even under Discovery Talent's interpretation, it has been unable to account to Lab Rat or properly pay Lab Rat for years.

28.     Defendants have licensed *Dirty Jobs* to third parties carrying Discovery's linear feed including Multiprogram Distributors like DirectTV and virtual Multiprogram Distributors like YouTube TV. But Defendants have also licensed those third parties the right to air video-on-demand episodes of *Dirty Jobs* without providing any compensation to Plaintiff, contrary to the Agreement's express terms.

29.     Defendants have also licensed third-party platforms the right to provide their consumers with video-on-demand airings of *Dirty Jobs* through various Discovery branded apps, such as Discovery+ and Max, that consumers access with the assistance of the third-party platform rather than by directly subscribing through DCL, which is in violation of the Joint Control provisions in Section 21 of the Agreement and the compensation provisions in Section 22.

30.     Discovery Talent has further breached the Agreement by failing to account for, and pay Plaintiffs for, such third-party agreements.

31.     Discovery Talent has also failed to account for linear airings on any Virtual Multiprogram Distributor in violation of Section 16(e) of the Agreement.

## V.     FACTS

### A.     Rowe's Creation Of *Dirty Jobs*.

32.     From 2001 to 2005, Rowe served as the host of the "Evening Magazine" program on KPIX-TV in San Francisco. He did a news segment for KPIX entitled "Somebody's Gotta Do It," profiling individuals with a variety of unusual occupations, professions and hobbies. Rowe obtained the rights to "Somebody's Gotta Do It" from KPIX and created a pilot episode to shop to various networks. The pilot focused mainly on individuals with grimy and unusual occupations.

33.     Discovery liked the pilot and engaged Rowe to appear in and produce a few television episodes based on the pilot, which ultimately became known as *Dirty Jobs.*

34.     In this series, Rowe was not a typical television host. Instead, he became a serial apprentice working alongside fish processors, coal miners, septic-tank technicians, and countless other hardworking professionals tackling these dirty jobs.

35.     *Dirty Jobs* quickly became one of Discovery Channel's most successful television series and aired for eight seasons between 2005 and 2012.

36.     Rowe served as both the host and a producer (or executive producer) of all episodes of the series.

37.     *Dirty Jobs* consistently was one of the top-rated series on cable television, ranking highly in the adult 18-49 audience, the most important and lucrative demographic for Discovery and its advertisers.

38.     *Dirty Jobs* was also a critical success, and was nominated for prime-time Emmy awards in 2008, 2009 and 2010.

39.     Rowe also appeared as an on-camera host or narrator of several other popular Discovery Channel series and specials, including narrating Discovery's *Deadliest Catch* about crab fishermen in Alaska, as well as the on-camera host of the follow-up series *After the Catch*.

40.     Rowe's unique identification with the occupational reality-show genre and his reputation as a hard-working everyman has earned him accolades as one of America's most likeable and trusted media personalities.

41.     As a result of his frequent appearances and constant promotional efforts for Discovery, Rowe became a prominent face and voice on Discovery's flagship Discovery Channel. The success of *Dirty Jobs* and Rowe's increasing importance to Discovery gave him the ability to negotiate the very favorable Prior Agreements.

42.     But Discovery regularly ignored the terms of the Prior Agreements or took unjustifiable accounting positions. This led to Rowe auditing Discovery in 2015 and further led to several mediations with Discovery. Ultimately, the parties reached a settlement and entered into the Agreement which thereafter governed their relations with respect to *Dirty Jobs*.

**B.     Pertinent Media Distribution Terminology.**

43.     This Complaint, and the Agreement upon which it is based, use the following media distribution terms.

44.     "Linear Service" means a broadcast where a viewer accesses content in accordance with a predetermined programming schedule and not based on a schedule determined by the viewer.

45.     "Multichannel Distributor" means a Multichannel Video Programming Distributor, sometimes abbreviated MVPD: A media distribution company that provides multiple television channels in a linear format as part of a subscription-based pay TV service. Multichannel

Distributor is defined in the Telecommunications Act of 1996 as "a cable operator, a multichannel multipoint distribution service, a direct broadcast satellite service, or a television receive-only satellite program distributor, who makes available for purchase, by subscribers or customers, multiple channels of video programming." *See* 47 U.S.C. § 522(13) (2023). The largest Multichannel Distributors today include traditional cable companies like Spectrum, Optimum, Comcast/ Xfinity, Charter, and Cox Enterprises, telecommunications companies like Verizon and AT&T, and dedicated satellite television broadcasters like Dish Network.

46.    "Virtual Multichannel Distributor" means a Virtual Multichannel Programming Distributor, sometimes abbreviated "vMVPD": A media distribution service that delivers multichannel television programming in a linear format over the Internet using a subscription-based revenue model. Unlike a traditional Multichannel Distributor that depends on satellite and cable infrastructure to deliver services, a Virtual Multichannel Distributor offers streaming video services that deliver content over the Internet. A Virtual Multichannel Distributor provides a linear viewing experience that is similar to traditional subscription television. YouTube TV is an example of a Virtual Multichannel Distributor.

47.    "Video on Demand" means a media distribution system that allows a user to access, or stream, videos, television shows, and films without a traditional video playback device and on demand without adhering to a pre-set, or linear, broadcasting schedule, sometimes abbreviated as "VOD".

48.    "Subscription Video on Demand" means a Video on Demand service for which customers pay a regular subscription fee for streamed video content, sometimes abbreviated as "SVOD".

49.    "Advertising Video on Demand" means a Video on Demand service in which revenues are earned by inserting paid advertising in the streamed video content, sometimes abbreviated as AVOD.

### C.    Discovery Talent Has Breached The Agreement By Treating Video-On-Demand Airings Of *Dirty Jobs* As Covered By The Definition Of "DCL Linear Service" In Section 16.

50.    Discovery Talent has conducted itself as though the Agreement permits it to license *Dirty Jobs* as video-on-demand content to third-party Multiprogram Distributors, such as DirecTV and Cox cable, and Virtual Multiprogram Distributors, such as YouTube TV and Hulu + Live, without any compensation to Lab Rat.

51.    Section 16 governs Lab Rat's right to a fixed ratings royalty for any episodes of the Program that airs on a Discovery linear service in the United States. The base royalty rate during the period in dispute has been $2,000 per airing.

52.    Section 16 defines DCL Linear Service as "a linear (i.e. any service that is not video on demand) 24/7 television programming network owned and/or operated by DCL such that DCL controls all the programming decisions related to such network, including without limitation, the scheduling of the programming that composes the network's linear feeds."

53.    Section 16 further provides that a DCL Linear Service "may have multiple different *simultaneous* feeds or versions to account for different resolutions (e.g., SD, HD, 4Kfeeds), different time zones (e.g., east coast and west coast feeds), different languages (e.g., Spanish language version) and/or different distribution technologies (e.g., cable feed, DBS feed, digital stream used by virtual MVPDs, authenticated digital TV everywhere streams), or any form of 'live streaming.'"

10

54.     Under this definition, two key requirements for a DCL Linear Service are (i) it must be "linear" and "not video on demand," and (ii) "DCL controls all the programming decisions" including "the scheduling of the programming that composes the network's linear feeds."

55.     Discovery Talent contends that the definition of DCL Linear Service in the Agreement includes video-on-demand airings to a consumer who is not a direct customer of Discovery but instead is a subscriber to a Multiprogram Distributor or Virtual Multiprogram Distributor.

56.     Discovery Talent insists that the Agreement does not entitle Lab Rat to additional compensation for these video-on-demand airings on a Multiprogram Distributor's platform, because these video-on-demand airings are encompassed within the definition of DCL Linear Service in Section 16 of the Agreement.

57.     Contrary to Discovery Talent's position that video-on-demand airings of *Dirty Jobs* on a Multiprogram Distributor or Virtual Multiprogram Distributor are part of a DCL Linear Service, the unambiguous definition of DCL Linear Service *does not* include on-demand access.

58.     In fact, the definition encompasses only "linear" airings. The definition of DCL Linear Service explicitly states that "linear" means a service "that is not video on demand."

59.     The definition also provides that an airing of *Dirty Jobs* is part of a DCL Linear Service *only* if "DCL controls all the programming decisions" including "the scheduling of the programming."

60.     Discovery Talent does not control the scheduling of a video-on-demand airing via a third-party Multiprogram Platform. The airing occurs at the demand of the consumer.

61.    Discovery has licensed multiple seasons of *Dirty Jobs* for video-on-demand to all (or substantially all) of the third-party Multiprogram Distributors (actual and virtual) (and possibly to other third parties) with *no* compensation to Lab Rat.

62.    Under the Agreement, video-on-demand rights to *Dirty Jobs* on third-party subscription platforms are governed by Section 22(e) where Lab Rat is entitled to Joint Control if in the United States, and a royalty of 50% of the Adjusted Gross Revenues anywhere in the world.

63.    Discovery Talent has also failed to account for linear airings on any Virtual Multiprogram Distributor, in violation of Section 16(e) of the Agreement which obligates it to find a method to evaluate viewership for purposes of calculating compensation to Lab Rat if the ratings service used by Discovery Talent does not measure linear exploitation.

**D.    Discovery Talent Has Breached The Agreement By Treating On Demand Airings Of *Dirty Jobs*, Made Available To Consumers On Third-party Platforms Via Discovery Apps, As Covered By The Definition Of "DCL Digital Platform" And Compensated Under Section 17.**

64.    Discovery Talent has also breached the Agreement by how it treats airings of *Dirty Jobs* made available to consumers on third-party platforms as video-on-demand content via Max or other Discovery apps. Discovery Talent has treated these airings as coming within the definition of "DCL Digital Platform" and it claims that any compensation owed to Plaintiffs is therefore governed by Section 17, rather than Section 22. Under Section 17, Discovery Talent pays Lab Rat a minimal royalty of $10 per 34,000 minutes viewed.

65.    "DCL Digital Platform" is defined as: "an Internet-delivered video-on-demand, direct-to-consumer service owned and operated by DCL that provides authenticated or non-authenticated access on a FVOD (*i.e.*, Free Video on Demand), SVOD or AVOD basis to end-users, such as Discovery GO or Motor Trend On-Demand. A DCL Digital Platform shall not

12

include a third-party digital distribution platform operated by a MVPD, virtual MVPD or any other third party (e.g., Xfinity OnDemand, Hulu, Netflix, HBOMax, Amazon Prime, Disney Plus, Apple Plus, YouTube), including without limitation, any Third-Party SVOD Platform."

66.     To be within a "DCL Digital Platform," the service must be a "video-on-demand, direct-to-consumer service owned and operated by DCL [Discovery]" and such a platform "shall not include a third-party digital distribution platform operated by a MVPD [Multiprogram Distributor], virtual MVPD or any other third party."

67.     When a customer watches a video-on-demand episode of *Dirty Jobs* by directly accessing a Discovery platform (e.g., through the websites *discoveryplus.com* and *max.com* or *go.discovery.com*) and the customer is paying Discovery directly where there is a subscription fee, the consumer gets access directly from a platform owned and operated by Discovery without using a third-party Multiprogram Distributor and the fees paid by the consumer go directly from the consumer to Discovery rather than from the consumer to a third party, such as a Multiprogram Distributor.

68.     By definition, such an airing takes place on a DCL Digital Platform because it occurs on a "direct-to-consumer service owned and operated by DCL" and does "not include a third-party digital distribution platform operated by a MVPD [Multiprogram Distributor], virtual MVPD or any other third party."

69.     In such cases, the parties agreed that Lab Rat would be compensated under Section 17 for minutes viewed.

70.     In contrast, when a consumer watches a video-on-demand episode by accessing it through a Discovery app (such as Max) on a service provided by a third-party Multiprogram

Distributor (such as Cox cable or DirecTV), the airing is not within the definition of DCL Digital Platform.

71.    In these instances, the episode is not provided through a "direct-to-consumer service owned and operated by DCL [Discovery]."

72.    The consumer is a direct customer of the third party, not Discovery. The customer does not receive the airing via a "direct-to-consumer service owned and operated by DCL," because the service includes "a third-party digital distribution platform operated by a MVPD [Multiprogram Distributor]," and the fees paid by the consumer go directly to the Multiprogram Distributor and not to Discovery.

73.    If the customer stops paying the subscription fees to the third party, access to the Discovery programming is shut off and the third party controls whether the programming is turned back on. In other words, a customer who accesses Max through a cable provider, but fails to pay the cable bill, loses access to Max. This is not a direct-to-consumer service owned and operated by DCL. Instead, the result is a third-party digital platform operated by a Multiprogram Distributor.

74.    To that end, the Agreement unambiguously provides: "A DCL Digital Platform shall not include a third-party digital distribution platform operated by a MVPD [Multiprogram Distributor], virtual MVPD or any other third party". Agr., at § 55(c).

75.    Discovery Talent contends that when it licenses *Dirty Jobs* as video-on-demand content via Discovery+, Max or other Discovery apps to Multiprogram Distributors, Virtual Multiprogram Distributors and other third-party platforms so that such platforms can provide such video-on-demand to their customers, each of those platforms is a "DCL Digital Platform" and compensation to Lab Rat is governed by Section 17. Not only is this recently concocted

interpretation by Discovery inconsistent with the Agreement, but Discovery has never accounted for such video-on-demand viewings.

76.     Discovery Talent's position that third parties can be part of the DCL Digital Platform is contrary to the unambiguous definition of DCL Digital Platform in the Agreement.

77.     The parties agreed to these narrow definitions of DCL Linear Service and DCL Digital Platform to counteract a position Discovery had taken under the Prior Agreements.

78.     Under the Prior Agreements, the term "DCL Service" was used to define what was on a Discovery Platform and was defined as a "content service in which DCL has an ownership interest or controls or shares control of content decisions, or to which DCL supplies content to be packaged with a DCL trademark or logo …."

79.     Discovery used this broad definition to claim that third-party platforms such as Hulu (which carried *Dirty Jobs*) were part of the DCL Service.

80.     Lab Rat was opposed to a continuation of this practice. Lab Rat insisted, and Discovery Talent agreed, that the Agreement contain the definition of DCL Digital Platform that excludes any use of a platform operated by a third party Multiprogram Distributor or any other third party.

E.    **Discovery Talent Has Breached Section 22 As It Pertains To Video-On-Demand Airings Of *Dirty Jobs* Involving Thirty Parties.**

81.    Section 22 generally governs Lab Rat's right to participate in compensation paid to Discovery from licensing *Dirty Jobs* to third-party platforms worldwide. In general, the provisions of Section 22 provide Lab Rat with greater compensation for licensing video-on-demand rights to *Dirty Jobs* on a third-party platform than Lab Rat receives for airings on a DCL Digital Platform.

82.    Discovery Talent has breached the Agreement by failing to account for and pay Plaintiffs amounts due under Section 22.

83.    Video-on-demand airings of *Dirty Jobs* that are accessed with the assistance of a third-party carrier (for example a Multiprogram Distributor or Virtual Multiprogram Distributor) are not "direct-to-consumer," as contemplated in Section 17 or part of the DCL linear service as contemplated in Section 16. Video on Demand airings through a third-party intermediary are covered by Section 22 of the Agreement. That is the case whether the airings are accessed through a Discovery app or not.

84.    As one example, Discovery has licensed DirecTV certain episodes of *Dirty Jobs* that DirecTV makes available to its subscription customers through Direct TV's video-on-demand section of its platform and its offering of the Max app streaming service. This licensing is covered by Section 22 of the Agreement which governs licensing to third-party platforms.

85.    Discovery Talent has breached the Agreement by failing to pay Lab Rat fifty percent (50%) of the Adjusted Gross Receipts (as defined in the Agreement), derived from such exploitation.

**F.**     **Discovery Talent Has Breached The Joint Control Requirements Of The Agreement.**

86.     Any exploitation of *Dirty Jobs* via a third-party Subscription Video on Demand platform in the United States is subject to Lab Rat's Joint Control. Section 21 requires Discovery Talent to obtain Lab Rat's prior written consent before it can proceed. Discovery Talent has breached this provision.

87.     Section 22(k) governs exploitation of *Dirty Jobs* on a third-party Advertising Video on Demand Platform and Section 22(l) governs all other exploitations of *Dirty Jobs* in any other manner not specifically covered elsewhere. Exploitation on a third-party platform governed by sections 22(k) or 22(l) requires the prior written consent of Lab Rat and thus a negotiation of Lab Rat's share of revenues from such exploitation.

88.     Discovery Talent has breached the Agreement by failing to honor the Joint Control provisions. Discovery Talent's breaches include, for example, participating, authorizing, facilitating or acquiescing in DCL's grant of licenses to Multiprogram Distributors and other third parties to engage in airings of *Dirty Jobs* without consulting with or informing Lab Rat, and without obtaining its prior written consent.

## <u>COUNT I</u>

### (*Breach of Contract by Discovery Talent*)

89.     Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if set forth fully and at length herein.

90.     Discovery Talent is liable to Plaintiffs for breach of contract. The parties entered into a valid and enforceable agreement, which was the Agreement entered into on January 1, 2020.

91.     Plaintiffs have fully performed their obligations under the Agreement.

92.    Discovery Talent has failed to honor its contractual obligations.

93.    It has breached Section 17 requirements with respect to royalties.

94.    It has breached the revenue sharing requirements of Section 22.

95.    It has failed to properly account for, and remit, sums due the Plaintiffs under the Agreement.

96.    Discovery Talent has also breached the consultation and consent requirements of Joint Control.

97.    By granting to Plaintiffs one-half of the benefits, that is, the Adjusted Gross Receipts, of *Dirty Jobs* in the manner specified in the Agreement, an implied obligation arose on the part of Discovery Talent not to render valueless the right conferred by the contract.

98.    This was especially true because Discovery Talent breached the express covenant of the contract to refrain from making any agreement affecting the rights conveyed to Plaintiffs without their approval.

99.    In its disregard for the requirements of Joint Control, Discovery Talent breached the implied covenant of good faith and fair dealing.

100.    This, in turn, resulted in the reduction and diversion of profits from Plaintiffs to the Defendants.

101.    Having breached the contract, Discovery Talent is not permitted to retain its profits resulting from the wrong.

102.    Plaintiffs have made demand on Discovery Talent for compliance with the terms of the Agreement which Discovery Talent has refused.

18

103.    As a result of Discovery Talent's multiple breaches of the Agreement, Plaintiffs have been damaged and are entitled to recover compensatory damages in an amount exceeding $75,000 (exclusive of interest and costs), the actual amount to be determined at trial.

## COUNT II

*(DCL's Breach of Guarantee)*

104.    Plaintiffs incorporate by reference the allegations in each of the preceding paragraphs as if set forth fully and at length herein.

105.    The Agreement is backed by the Guarantee executed by DCL, pursuant to which DCL unconditionally guaranteed to Lab Rat and Rowe the obligations of Discovery Talent under the Agreement

106.    Section 1 of the DCL Guarantee provides that "[a]s a material inducement to Lab Rat entering into this Agreement, and in consideration of the benefits DCL will derive from the execution of this Agreement, DCL hereby unconditionally and irrevocably guarantees to Lab Rat and Rowe the full, complete and faithful performance by Company of each and every of Company's obligations under this Agreement, as it may be amended from time to time, including, without limitation, all payment obligations …."

107.    Section 6 of the DCL Guarantee provides that "obligations of DCL hereunder are independent of the obligations of Company."

108.    Section 6 further provides that "DCL waives any right to require Lab Rat and Rowe to proceed against Company, to apply or proceed against or exhaust any security held by Lab Rat and Rowe or to pursue any remedy in their power against Company or any other party prior to, or concurrently with, proceeding against DCL. Lab Rat and Rowe may maintain a separate action

against Company without in any manner waiving or compromising any rights which either may have against DCL."

109.    Pursuant to Section 3 of the DCL Guarantee, DCL waived "(i) notice of the acceptance of this guaranty; (ii) notice of the amount of indebtedness under the Agreement now existing or which may hereafter exist; (iii) notice of demand for payment and/or performances, notice of default, notice of nonpayment or nonperformance, presentment, protest, notice of protest and notice of dishonor of the Agreement or any of the Guaranteed Obligations; (iv) notice of assignment, transfer or negotiation of the Agreement; and (v) all other notices to which DCL might otherwise be entitled in connection with this guaranty, the Agreement or any of the Guaranteed Obligations."

110.    Section 7 of the DCL Guarantee provides that if Lab Rat is forced to file suit for breach of the guarantee, "the prevailing party shall be entitled to recover its costs of suit, including without limitation, reasonable attorneys' fees."

111.    Section 10 of the DCL Guarantee stipulates that the "guarantee shall be governed by and construed in accordance with the laws of the State of New York." It further provides that "parties agree that the courts in New York County, New York shall have exclusive jurisdiction to resolve any claim, dispute or matter arising out of, relating to or in connection with this guarantee, including any dispute as to its existence, validity, interpretation, performance, breach or termination" and the parties submit "to the exclusive jurisdiction of the courts in New York County, New York."

112.    Discovery Talent is in default of its obligations under the Agreement.

113.    Pursuant to the DCL Guarantee, and because of Discovery Talent's default, DCL is liable for the entirety of the guaranteed payments and for the costs and attorney's fees incurred by Lab Rat in enforcing the guarantee.

114.    DCL is in breach of its obligations under the Guarantee.

115.    Plaintiffs have sustained damages because of DCL's breach and are entitled to recover compensatory damages in an amount exceeding $75,000 (exclusive of interest and costs), the actual amount to be determined at trial.

116.    In addition, upon the Court's finding in favor of Plaintiffs against DCL, Plaintiffs shall be entitled to recover from DCL their costs of this lawsuit including their reasonable attorneys' fees.

**WHEREFORE**, Plaintiffs Rowe and Lab Rat pray that judgment be entered against Defendants as follows:

A.    Awarding Plaintiffs their damages from Defendants for breaches of the Agreement and DCL Guarantee in an amount to be determined at trial, and in any event no less than $75,000;

B.    Awarding Plaintiffs their costs of suit, including reasonable attorneys' fees, as against DCL;

C.    Awarding Plaintiffs pre- and post-judgment interest on all amounts found to be due, and statutory costs; and

D.    Granting such other and further relief as the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated June 2, 2025 in New York, New York.

Respectfully submitted,

BARTON LLP

By: _____

Randall L. Rasey
711 Third Avenue, 14th Floor
New York, NY 10017
(212) 687-6262
rrasey@bartonesq.com
jcabanas@bartonesq.com

and

NUSINOV SMITH LLP
Jeffrey E. Nusinov (Admission Pending)
2800 Quarry Lake Drive, Suite 160
Baltimore, MD 21209
(410) 554-3600
jnusinov@nusinovsmith.com

*Attorneys for Plaintiffs Michael G. Rowe and Lab Rat Productions, Inc.*