UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MICHAEL G. ROWE and
LAB RAT PRODUCTIONS, INC.,

<em>Plaintiffs</em>,

v.

DISCOVERY COMMUNICATIONS, LLC and
DISCOVERY TALENT SERVICES, LLC,

<em>Defendants</em>.

1:25-cv-04616-VSB-GWG

Oral Argument Requested

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS

SCAROLA ZUBATOV SCHAFFZIN PLLC<br>
620 Fifth Avenue, 2nd Floor<br>
New York, NY  10020<br>
Tel.:  (212) 757-0007<br>
<em>Attorneys for Plaintiffs</em>

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

I.      Introduction ........................................................................................1

II.     Discovery breached the Agreement with respect to third-party
        Video-on-demand airings.....................................................................6

        A.   Discovery is in breach of §22(e), which covers all
             subscription third-party video-on-demand offerings. ..................7

        B.   Discovery tortures language to conjure an argument, but
             the language discussed in §22(e) actually confirms
             Discovery's breach...................................................................8

        C.   Discovery tacitly concedes breach of §22(k), which it does
             not address at all, with respect to all video-on-demand airings
             on a third-party advertising-supported platform. .......................12

        D.   Discovery is at the least in breach of §22(l), a catch-all
             provision that covers any exploitation not expressly
             addressed in the Agreement. .....................................................13

III.    Discovery breached the Agreement by failing to pay Rowe
        for video-on-demand airings accessed through a Discovery
        feature on third-party platform.........................................................13

        A.   Video-on-demand airings accessed through a Discovery
             feature on a third-party platform are not governed by §17........15

             1.   Because §17 expressly applies only to a Discovery
                  "direct-to-consumer service," it does not cover
                  on-demand airings to subscribers of an MVPD/virtual
                  MVPD/other third-party, and not subscribers of a
                  Discovery DCL Digital Platform. ......................................15

             2.   Because §17 expressly states it does "not include a
                  third-party digital distribution platform," Discovery
                  cannot read it to include such video-on-demand airings
                  on third-party digital distribution platforms. ......................17

             3.   All of Discovery's §17 arguments fail. ..............................19

    *B.* Video-on-demand airings accessed through a Discovery feature on a third-party platform are governed by §22, and Discovery is in breach for failing to account to and pay Rowe accordingly ....................................................................23

    *C.* Even if §17 were applicable to on-demand airings accessed through a Discovery feature on a third-party platform, Discovery would still be in breach of the Agreement, as it has failed to account for such airings. ...........................23

IV.   Because Rowe's interpretation of the Agreement is reasonable, the motion must be denied. ...........................................................................24

V.    Discovery breached the Agreement by failing to account for all linear airings governed by Agreement §16. ................................................25

VI.   DCL is in breach of the Guarantee. ...................................................................27

TABLE OF AUTHORITIES

**Cases**

*Chambers v. HSBC Bank USA, N.A.*,
  2020 WL 7261155 (S.D.N.Y. Dec. 10, 2020) .......................................................................24-25

*Consarc Corp. v. Marine Midland Bank*,
  996 F.2d 568 (2d Cir. 1993) ........................................................................................... 25

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
  595 F.3d 458 (2d Cir. 2010) ........................................................................................... 25

*New York v. Town of Clarkstown*,
  95 F. Supp. 3d 660 (S.D.N.Y. 2015) ............................................................................ 26

*Perks v. TD Bank, N.A.*,
  444 F. Supp. 3d 635 (S.D.N.Y. 2020) .......................................................................... 25

Plaintiffs, by their counsel Scarola Zubatov Schaffzin PLLC, submit this Memorandum of Law in Opposition to Defendants' Motion to Dismiss.

## I.       Introduction

Plaintiff Mike Rowe is the creator and host of the popular television show *Dirty Jobs*. Rowe and his company, Lab Rat Productions, Inc. (together, "Rowe"), brought this action against Defendants Discovery Communications, LLC and Discovery Talent Services, LLC (collectively, "Discovery") for breach of the Participation Agreement ("Agreement") that ensures Rowe's ongoing participation in decision-making and revenue-sharing from all exploitation of *Dirty Jobs*. Discovery has failed to account to and pay Rowe, and to honor Rowe's right to joint control.

The Agreement sets up, in broad terms, a simple, sensible tripartite structure through which Discovery would compensate Rowe in conjunction with its exploitation of *Dirty Jobs* episodes:

1.  Agreement §16 addresses the most traditional kind of airings (such as by cable television channels) of *Dirty Jobs* episodes on a predetermined schedule. Such airings are known in the industry and referred to in the Agreement as "linear" airings, to be distinguished from video-on-demand viewing, where the viewer controls the time an episode airs. *See* Complaint ¶¶44 & 47.

2.  Agreement §17 addresses video-on-demand airing when the on-demand platform is a direct-to-consumer Internet-based, *i.e.*, "digital," platform owned and operated by Discovery itself. The Agreement refers to this category as on-demand exploitation on a "DCL Digital Platform" (the Agreement refers to Discovery as "DCL"), with Agreement §55(c) specifically defining the term "DCL Digital Platform" as "an Internet-delivered video-on-demand, direct-to-consumer service owned and operated by [Discovery]." This definition then expressly distinguishes a DCL Digital Platform from a third-party platform, providing it "shall not include a third-party digital distribution platform operated by a [linear provider or Internet-based linear provider]

or any other third-party (e.g., Xfinity, OnDemand, Hulu, Netflix, HBOMax, Amazon Prime, Disney Plus, Apple Plus, YouTube), including without limitation any Third-Party [Subscription Video-on-Demand] Platform."

3. Payment for *all* other *Dirty Jobs* exploitation by Discovery is governed by Agreement §22 that controls all rights in *Dirty Jobs* licensed to third-parties — as relevant here, when Discovery licenses *Dirty Jobs* episodes to third-parties for on-demand airing, §22 governs and provides Rowe substantially higher compensation than §17. This is covered in §22(e) for subscription-based offerings and §22(k) for advertising-supported offerings. Agreement §21 also allows Rowe joint control over most such licensing, requiring his sign-off. Critically, §22 also makes clear it covers *all* other *Dirty Jobs* exploitation (unless explicitly included in another section or explicitly excluded from §22). The catch-all provision §22(l) states: "Other Exploitation: All exploitation of [*Dirty Jobs*] shall be governed solely by the terms and conditions of this Agreement and any other method of exploitation not expressly stated in this Agreement shall be subject to further negotiation and prior written agreement between the Parties."

In the face of this clear structure, Discovery has breached the Agreement, including by failing to pay royalties due under §22 and violating the joint control provisions. Now, on this motion to dismiss, Discovery attempts to muddy the waters by disingenuously twisting the plain meaning of terms specifically negotiated by the parties and ignoring entirely terms it cannot overcome but which confirm the validity of Rowe's claims. As explained below, Discovery's arguments as to Rowe's breach allegations fail for two categories of reasons. First, none of Discovery's arguments establish that Rowe fails to state colorable breach claims under §22(e) and (k); the plain contract language establishes there has been a breach. Second, on the principal breaches, Discovery hinges its motion on the idea that some exploitation is not governed by the Agreement *at all* (Motion at 10-11, 14), but any such scenario is foreclosed by the §22(l) catch-all provision that in fact covers all else.

The Complaint alleges three main categories of breaches by Discovery:

First Type of Breach:  The first breach primarily involves one subset of on-demand *Dirty Jobs* airings by third parties covered by §22(e).  Specifically, some providers such as Comcast or DirecTV offer *both* traditional *linear* airings covered by Agreement §16 *and also on-demand* viewing covered by §22(e).  Discovery takes the position that because these companies offer linear airing (for which it must pay Rowe under Agreement §16), Discovery can license *Dirty Jobs* to them for on-demand viewing *and pay Rowe nothing* (and not honor his §21 joint control right).

The Agreement's language, and logic, squarely defeat Discovery's argument.  At its very outset, §22(e) defines its scope clearly and plainly as applying to all "subscription video on demand ('SVOD') platforms owned or operated by third parties ('Third Party SVOD Platforms')."  Any such on-demand offering provided by a third-party that also happens to operate a traditional linear service would be unambiguously encompassed by this definition.

Failing to address this broad definition of "Third Party [Subscription Video-on-Demand] Platforms," Discovery instead relies wholly on a *clarification* of the definition contained in a "For the avoidance of doubt" sentence later in §22(e).  Ironically, that sentence is there to foreclose the very kind of argument Discovery now makes.  As discussed below, that sentence confirms *expressly* that when the same provider offers *both* traditional linear airings on a preset schedule *and*, separately, on-demand airings, the on-demand component is "*include[d]*" in the scope of 22(e).  *See* §22(e) ("For the avoidance of doubt, a Third-Party [Subscription Video-on-Demand] Platform includes any [Subscription Video-on-Demand] platform operated by a third-party separate and independently from such third-party's [traditional linear multi-channel platform] and/or virtual [traditional linear multi-channel platform] offering….")

Discovery ignores that plain definition, and instead turns to a tendentious misreading that (i) asserts that the clarification about what is "*include[d]*" in §22 is really a condition providing *exclusions* (as explained below) and (ii) worse, asserts that the Agreement does not cover this exploitation at all and that Rowe gets nothing for this critical element of *Dirty Jobs* exploitation,

3

thereby, further, wholly ignoring the express catch-all provision in §22(l), which covers "any other method of exploitation not expressly stated in this Agreement." Discovery loses that issue under the Agreement's plain language, and, for current purposes, certainly has no viable motion to dismiss.

Discovery's motion also fails because it does not even address the alleged breach of §22(k) (Complaint ¶¶87-103), governing advertising-supported (as opposed to subscription-based) on-demand airings ("video on demand platforms that license content through sharing of advertising revenue ('AVOD') owned or operated by third parties"). Making no argument, Discovery cannot prevail on that issue.

Second Type of Breach: Discovery has also failed to account to or pay Rowe for its exploitation of *Dirty Jobs* when accessed in a manner that "include[s] a third-party digital distribution platform operated by a … third party" and also a Discovery feature (such as Discovery+ or Max) (Agreement §55(c)); in other words, through platforms operated by third-parties such as DirecTV. Subsections §22(e), (k) or (l) encompass all these licenses, as discussed above. Discovery argues, however, that these are all covered by §17, which governs exploitation exclusively on a "[Discovery] Digital Platform." But to make this argument, Discovery must ignore two express requirements.

(1) To be within §17 (Discovery's assertion), the distribution service must be a "direct to consumer service owned and operated by [Discovery]." Agreement §55(c). To be a Discovery direct-to-consumer service, Discovery must have a direct relationship with the customers and, for example, set the price, bill the consumer, receive payment from the consumer and control access to the video-on-demand service. But for all alleged breaches, none of this is true. Instead, the consumer buys a subscription to a third-party service (*e.g.*, Cox Cable or DirecTV), which sets the price, bills the consumer, receives payment, and can turn access to the video-on-demand service on and off. Discovery does not have a "direct to consumer service owned and operated by" Discovery in the instances where Rowe alleges breach.

(2) To be within §17, the distribution must be entirely on a Discovery platform (for

4

example, Discovery+ or Max) and not include a third-party.  The Agreement plainly states: "A [Discovery] Digital Platform *shall not include a third-party digital distribution platform*…." Agreement §55(c).  (Emphasis added.)  When a consumer accesses a *Dirty Jobs* episode via the Discovery using a subscription to *a third-party digital distribution platform*, the third-party's video-on-demand platform is by definition "include[d]" (it is not Discovery's platform).  Those arrangements are not covered by §17 as Discovery asserts; they are plainly governed by §22.

Third Type of Breach:  Discovery has failed to account fully to Rowe for certain linear airings governed by §16.  Discovery does not contend it had no obligation to do so.  Instead, it asserts Rowe's allegations lack sufficient detail.  The pleaded allegations are sufficiently detailed and plausible to plead breach.

Discovery's motion should be denied in its entirety.

*An Explanation of Pertinent Terminology*

The Agreement is replete with industry jargon and acronyms (or defined contract terms). Complaint ¶¶43-49 explain the most pertinent terms.  This brief will substitute more accessible, colloquial terminology where possible without introducing inaccuracy.  But because the Agreement itself uses that media distribution industry terminology extensively, the Complaint's explanation is summarized here.

- In a "linear" service a viewer accesses content in accordance with a predetermined programming schedule rather than on-demand.  Colloquially, leaving aside emerging nuances in technology, it could be thought of as the traditional, historical, scheduled television viewing experience.

- A Multichannel Video Programming Distributor, abbreviated "MVPD," provides multiple television channels in a linear service format as part of a subscription-based pay-TV service.  Examples include traditional cable companies like Spectrum and Comcast and dedicated satellite television broadcasters like Dish Network and DirecTV.  Unlike a traditional MVPD that depends on satellite and cable infrastructure to deliver services, a "Virtual Multichannel Programming Distributor," abbreviated "vMVPD," streams the same kind of subscription-based linear multichannel video content over the Internet.  YouTube TV is an example of an vMVPD.

5

- "Video on Demand," abbreviated "VOD," is a media-distribution system allowing users to access, or stream, video content without a traditional video playback device and on demand, *viz.*, without adhering to a pre-set, or linear, schedule.

- "Subscription Video on Demand," abbreviated "SVOD," is a Video on Demand service for which customers pay a regular subscription fee.

- "Advertising Video on Demand," abbreviated "AVOD," is a Video on Demand service in which revenues are earned by inserting paid advertising in the streamed video content.

## II.    Discovery breached the Agreement with respect to third-party video-on-demand airings.

The first category of breach, discussed at Complaint ¶¶28, 50-63, is tied to Discovery's assertion that when it licenses *Dirty Jobs* episodes to third-party traditional linear television providers (*i.e.*, those with scheduled multi-channel programming, including, essentially, cable, satellite and Internet-delivered, such as Spectrum, DirecTV, and YouTube TV) for video-on-demand airing in addition to a linear offering, the "video-on-demand services are simply not part of the compensation that Plaintiffs bargained for in the Agreement." (Motion at 8)  To be clear, Discovery argues Rowe gets *nothing* for such licensing in this substantial market segment.  This is nonsensical — contradicted by the Agreement's plain language that includes such video-on-demand offerings in Agreement §§22(e) and (k).  More, even if such offerings were not covered by §22(e) and (k) (they plainly are), they would be covered by the §22(l) catch-all provision ("any other method of exploitation not expressly stated in this Agreement shall be subject to further negotiation and prior written agreement between the Parties"), which Discovery ignores entirely.  Discovery's argument is remarkable for its overreach.

Discovery previously contended video-on-demand on a third-party platform was a linear

6

service covered by Agreement §16, but now concedes it is not.[1]  This concession compels the conclusion Discovery is in breach.  Discovery cannot (and does not) contend video-on-demand on a third-party platform is covered by §17, which is limited to "direct-to-consumer service owned and operated by [Discovery]," and which expressly "shall not include a third-party digital distribution platform."  Video-on-demand delivered on a third-party platform thus can only be covered by §22, which covers all video-on-demand airings involving a third-party, *viz.*, by §§22(e) and (k) or, if not, then necessarily by the catch-all of §22(l).  There is, thus, no such thing as what Discovery contends:  "simply not part of the compensation that Plaintiffs bargained for."  Regardless of which subpart of §22 applies, Discovery's argument fails, it is in breach, and this motion must be denied.

> **A.** **Discovery is in breach of §22(e), which covers all subscription third-party video-on-demand offerings.**

Agreement §22(e) defines and explains the treatment of third-party subscription video-on-demand exploitation:   "With respect to subscription video on demand ('SVOD')[2] platforms owned or operated by third parties ('Third Party SVOD Platforms'), the following shall apply."  It provides that for video-on-demand airings on Third-Party SVOD Platforms both "outside of

---

[1] This argument wholly changes its pre-Complaint position.  The Complaint alleges (¶¶55, 56) that Discovery's <u>sole</u> justification proffered for this breach had been that this revenue stream is covered by Agreement §16 for traditional television (linear) offerings by cable/satellite providers — a flat-wrong position because "DCL Linear Service" is expressly limited to "linear" (pre-scheduled) programming and "not video on demand."  Agreement §55(d).  Discovery now distances itself from that position, asserting:  "Defendants are not claiming (and have never claimed) that this type of video-on-demand viewing … is itself a linear service."  (Motion at 8)  But Discovery has no replacement except to argue the contract-contradicted conclusion that Rowe gets nothing from this substantial revenue stream covered by specific terms (or, at the very least, by the catch-all of §22(l)).

[2] As explained above, consumers can watch video-on-demand offerings on a subscription-based service (hence, "SVOD") (covered in §22(e)) or a similar service supported by advertising revenue (known as "AVOD," discussed below in relation to Agreement §22(k)).  A "third-party" as used here means a party other than Discovery.

the United States, [and] in the United States … Rowe shall receive fifty percent (50%) of the Adjusted Gross Revenues."

Rowe is thus entitled to, but has been denied, 50% of all exploitation benefits of third-party SVOD offerings of *Dirty Jobs*.  The definition of "Third Party SVOD Platforms" is unqualified and unambiguous:  "subscription video on demand ('SVOD') platforms owned or operated by third parties ('Third Party SVOD Platforms')."  *Id.*  When, for example, DirecTV streams an old *Dirty Jobs* episode as video-on-demand, this unambiguously fits within the definition.  DirecTV is a subscription service owned and operated by a third-party (not Discovery).  Accordingly, DirecTV's video-on-demand offerings are "subscription video on demand ('SVOD')" and "owned or operated by [a] third part[y]."  *Id.*; Complaint ¶¶84-88.  That is the end of the issue:  Rowe is entitled to 50% of Discovery's exploitation benefits, and Discovery has not paid and is in breach.  *Id.*  Discovery has also breached Rowe's right to joint control as to United States airings.  *Id.*

> **B.** **Discovery tortures language to conjure an argument, but the language discussed in §22(e) actually confirms Discovery's breach.**

While wholly avoiding discussing the plain-language definition quoted in the preceding section ― "subscription video on demand … owned or operated by third parties" — Discovery instead pretends a "For the avoidance of doubt" sentence in the same paragraph that expressly clarifies what the definition "*includes*" is somehow meant to *exclude* video-on-demand offerings licensed to traditional linear television providers.  Still worse, the decontextualized language Discovery relies on *actually clarifies* Rowe's participation when a third-party that offers traditional multi-channel linear television service *also* carries non-linear, video-on-demand

offerings of *Dirty Jobs*.[3]  Indeed, that clarification language expressly confirms Discovery has *breached*.

The §22(e) clarification language on which Discovery relies — including a further "For clarification" sentence which Discovery's significantly omits — reads:

> "For the avoidance of doubt, a Third-Party SVOD Platform includes any SVOD platform operated by a third-party separate and independently from such third-party's MVPD and/or virtual MVPD offering and for which DCL receives license fees separate and apart from any affiliate revenue.  For clarification, Amazon Channels, Netflix, Hulu SVOD would be considered a Third-Party SVOD Platform, but any 'live' offerings (i.e., exhibition of the Program simultaneous with a DCL Linear Service feed) within Sling, Hulu Live, Xfinity Streampix, or any other MVPD or virtual MVPD offering would not be considered a Third-Party SVOD Platform."

Latching onto the words "separate and independently" within this paragraph, while ignoring the rest, Discovery bluntly asserts, without further explanation, that "the video on demand that Plaintiffs allege they have not received compensation for is not of a type 'operated by a third-party separate and independently from such third-party's MVPD and/or virtual MVPD offering.'"  (Motion at 9)  That reading is untenable in numerous respects.

First, the sentence at issue is a "For the avoidance of doubt" provision clarifying, by its express terms, what is "*include[d]*," not something excluded.  It does not say, as Discovery would have preferred, that a third-Party SVOD Platform "*only* includes," or "*exclusively* includes" or "is *limited* to including" anything mentioned.  The "separate and independently" language is, thus, not meant to impose an additional condition — which would have been stated

---

[3] Notably, Discovery does not dispute that where a third-party provides solely subscription on-demand service offering *Dirty Jobs*, §22(e) clearly applies.  What it contends, however, is that where an MVPD or vMVPD, such as carriers of traditional linear multi-channel television service, also provide additional subscription on-demand service, §22(e) no longer applies to that on-demand service and, what is more, Rowe gets *no compensation whatsoever* for those on-demand airings.  But nothing in the Agreement expressly (or even implicitly) creates such an exception, and in fact, §22 expressly contemplates MVPDs/vMVPDs with both linear and video-on-demand.  Indeed, if such a conspicuous exclusion for the common situation of MVPDs also providing on-demand service had been intended, it surely would have been expressly stated.

differently and clearly and not in a "For the avoidance of doubt" sentence had that been intended — but to function as *a description* of the very nature of on-demand service, as distinct from (*i.e.*, separate and independent of) linear offerings.

The structure of paragraph §22(e) — including the "For clarification" sentence quoted above that Discovery omits and entirely ignores, and which specifically distinguishes scheduled linear television from the kinds on-demand offerings at issue — may be paraphrased as follows:

> "The following rules will apply to third-parties offering subscription on demand programming…. For the avoidance of doubt, where the same third-party entity offers regular scheduled programming and separately, offers a subscription-on-demand service, this paragraph *does* apply to the subscription-on-demand service. For clarification, Amazon Channels, Netflix, Hulu SVOD would all be considered third-party subscription-on-demand platforms, but if any third-party also happens to air *Dirty Jobs* in a scheduled, linear fashion, then the linear airing would not fall within the scope of this paragraph."

As contemplated by this paragraph, a third-party's on-demand service is *inherently* separate from and independent of the third-party's linear offerings (as explained further below), and Discovery, in trying to turn the "separate and independently" language into an additional condition, fails even to explain in any way what it would mean for on-demand service *not* to be separate and independent from a linear airing. It fails, as well, to offer any explanation, whether through arguments or facts, of why its baseless, naked say-so on a motion to dismiss that the particular third-party subscription on-demand airings at issue are not separate and independent should be credited. Discovery's reading also begs the question of when, in its view, a third-party's on-demand service *would ever be* separate and independent of its linear service and why such a crucial question would have been left unanswered by the Agreement, if indeed the Agreement had intended to make the "separate and independently" language a but-for condition of the sort Discovery imagines.

Discovery's blatant misreading turns the paragraph's language on its head: as above, the sentence on which Discovery relies confirms that the definition "includes" a particular type of on-demand service — *the very type that Discovery now argues is excluded!* A sentence inserted to make crystal-clear that any on-demand service by the same third-party that also, separately,

10

happens to offer linear service still falls within the scope of this paragraph, now, in Discovery's hands, would wind up meaning that such on-demand service *never* falls within the scope of this paragraph when the same third-party fortuitously offers both services — because the two services, Discovery contends, are not separate and independent of each other. That is pure sophistry and, especially on a motion to dismiss, should be rejected by this Court.

Discovery's interpretation also fails entirely to grapple with the subsequent "For clarification" sentence Discovery tellingly omits ― for the obvious reason that that sentence is fatal to its contention. That sentence states that only "live," *i.e.*, linear, offerings from subscription on-demand platforms will be excluded from this paragraph's scope. That it was deemed necessary to carve out linear MVPD/traditional television offerings in this way further confirms, contrary to Discovery's contention, that *on-demand* offerings by MVPD traditional television carriers *are*, in fact, governed by §22(e) (as all other Agreement language provides). No other construction of this clarification is plausible.

Discovery's argument that an MVPD's linear offerings and any on-demand service the MVPD happens to offer are not separate also simply makes no sense as applied to the relevant facts, including as alleged in the Complaint. As the Complaint (¶45) explains, an MVPD (Multichannel Video Programming Distributor) is industry terminology for a "media distribution company that provides *multiple* television channels *in a linear format*." (Emphasis added.) In other words, MVPDs, such as Spectrum or DirecTV, are carriers of multiple television channels with scheduled programming (such as the 10 p.m. news or a network series airing every Tuesday at 9 p.m.). Thus, one of an MVPD's key distinguishing features is providing programming on the platform's schedule, *not on-demand* within consumer control. A video-on-demand airing, of course, must be accessed by consumers at a time of their choosing through the VOD platform rather than viewed during a pre-scheduled time slot — as otherwise the video-on-demand could not be "on demand" — and, as such, is inherently separate and independent of the MVPD's linear offerings. For these reasons, Discovery's naked assertion that some third-party's video-on-demand offering is not really operated "separate and independently" from its MVPD offerings is

11

contrary to the Agreement's language (as well as the pleaded allegations (Complaint ¶¶83-84), which must be accepted as true for purposes of this motion).[4]

As pleaded, Discovery has failed to honor Rowe's joint control rights, failed to account to Rowe, and failed to pay Rowe by licensing video-on-demand airings of *Dirty Jobs* to third-party multi-channel platforms, in violation of §22(e).  Complaint ¶¶30-31, 82, 89-103.  The Complaint thus includes all elements of a properly pleaded breach of contract claim.  The motion should be denied.

  **C. Discovery tacitly concedes breach of §22(k), which it does not address at all, with respect to all video-on-demand airings on a third-party advertising-supported platform.**

While §22(e) addresses *subscription* video-on-demand exploitation of *Dirty Jobs* episodes, §22(k) addresses *advertising-supported* video-on-demand exploitation.  Discovery's motion ignores §22(k) entirely, presenting no argument whatsoever that the Complaint has not stated a claim under §22(k).  The motion fails on this issue without more.

For the avoidance of doubt, breach of §22(k) is clear and simple.  First, as to coverage and control, §22(k) states:

> "With respect to video on demand platforms that license content through sharing of advertising revenue ("AVOD") owned or operated by third parties (e.g. Tubi and Pluto TV) ("Third Party AVOD Platforms"), DCL agrees that it will not include the Program in any such licenses to such platforms absent written agreement with Lab Rat."

As with §22(e), the scope of §22(k) is unambiguous and encompasses all "video on demand platforms that license content through sharing of advertising revenue ('AVOD') owned or operated by third parties."  *Id*.  Rather than allocating a 50% share to Rowe as does §22(e),

---

[4] And if it were required, Rowe could amend to add the explicit allegation that "The video-on-demand platforms of MPVDs and virtual MPVDs are operated separate and independently from the third party's MPVD and/or virtual MPVD offerings."

§22(k) requires that Discovery negotiate a written agreement with Rowe before Discovery licenses an AVOD platform. The Complaint alleges Discovery has failed to account to Rowe, and failed to negotiate with Rowe, for revenues from licensing advertising-supported exploitation, which includes video-on-demand airings of *Dirty Jobs* both by traditional multi-channel scheduled television providers and other emerging advertising-supported third-party video-on-demand platforms (such as YouTube) — *all* in violation of §22(k). Complaint ¶¶87-103. Discovery does not contest this pleading, and the motion should be denied.

      **D.     Discovery is at the least in breach of §22(l), a catch-all provision that covers any exploitation not expressly addressed in the Agreement.**

As noted above, Discovery's arguments ultimately fail even if the Court did not agree with Rowe's interpretation of §§22(e) and (k) — an interpretation that would be supported by compelling extrinsic evidence of the parties' extensive negotiations if such evidence were deemed necessary. Discovery would nonetheless still be in breach because it inexplicably argues what the Agreement expressly precludes: that some of the exploitation at issue in the Rowe breach claims is not covered *at all*. It asserts video-on-demand offerings by traditional multichannel linear television providers "are simply not part of the compensation that Plaintiffs bargained for in the Agreement." (Motion at 8) That argument is inexplicable. The Agreement is constructed, based upon extensive negotiation, to preclude that very result. Agreement §22(l) plainly states: "*any other method of exploitation* not expressly stated in this Agreement shall be subject to further negotiation and prior written agreement between the Parties." (Emphasis added.) As such, no third-party video-on-demand airings can be exploited by Discovery outside the Agreement without Rowe's participation. If any third-party video-on-demand exploitation is not covered by §§22(e) and (k), it would be covered by §22(l). Discovery failed to address §22(l) at all. Its motion fails because of that catch-all provision as well.

**III.    Discovery breached the Agreement by failing to pay Rowe for video-on-demand airings accessed through a Discovery feature on third-party platforms.**

The second category of breach arises because Discovery has attempted to conflate two

different ways consumers view on-demand episodes delivered through Internet-based and similar services: (i) consumers directly contracting with Discovery to use one of its proprietary online, video-on-demand platforms (a "DCL Digital Platform") to watch *Dirty Jobs*, e.g., on Discovery+ or Max (viewings governed by Agreement §17 that lead to relatively less revenue for Rowe) and (ii) consumers with no contract with Discovery that instead contract with traditional linear services (such as Spectrum) or Internet linear services (such as YouTube TV) or other third-party, which in turn pays a fee to Discovery to provide Discovery+ or HBO Max video-on-demand generally among their offerings (in which case, *Dirty Jobs* viewings lead to relatively more revenue for Rowe (under Agreement §22)). Discovery's conflation would shoehorn all such video-on-demand viewings into the first category — resulting in much less revenue to Rowe. But the Agreement's plain language makes clear such treatment is a breach. (Complaint ¶¶29, 64-85)

Discovery agrees such "video-on-demand airings of Dirty Jobs" are indeed video-on-demand airings. (Motion at 10-17) Discovery argues, however, such video-on-demand airings are either (i) governed by §17 (and Discovery has compensated Rowe for such viewings), or (ii) not covered by §17, but also excluded from §22, and thus "fall outside the compensation scheme of the Agreement altogether … and Rowe has in fact been overcompensated." (Motion at 10-11, 14) Every part of this argument is wrong.

Such on-demand viewings are not governed by §17, because they are not covered by §55(c) definition of a "DCL Digital Platform," which must be "direct-to-consumer" and "shall not include a third-party digital distribution platform." Agreement §55(c). As demonstrated here, in fact, such viewings are covered by subsections §§22(e), (k) or (l) (including for reasons discussed above with respect to third-party on-demand offerings). Finally, as also alleged and discussed here, if any such viewings were covered by §17, Discovery has still failed to account to and pay Rowe for them for years.

**A.      Video-on-demand airings accessed through a Discovery feature on a third-party platform are not governed by §17.**

Section 17's scope is expressly limited to "exploitation of any episode of the Program on a video-on-demand basis in the United States on a DCL Digital Platform."  Attempting to salvage a losing business position, Discovery ignores §17's language or the §55(c) definition of "DCL Digital Platform."  That language unambiguously defeats Discovery's argument for three reasons.

**1.      Because §17 expressly applies only to a Discovery "direct-to-consumer service," it does not cover on-demand airings to subscribers of an MVPD/virtual MVPD/other third-party, and not subscribers of a Discovery DCL Digital Platform.**

Section 17 applies only to exploitation "on a DCL Digital Platform."  Agreement §55(c) defines "DCL Digital Platform":

> "'DCL Digital Platform' shall mean an Internet-delivered video-on-demand, <u>direct-to-consumer service owned and operated by DCL</u> that provides authenticated or non-authenticated access on a FVOD (i.e., Free Video on Demand), SVOD or AVOD basis to end-users, such as Discovery GO or Motor Trend On-Demand.  A DCL Digital Platform <u>shall not include a third-party digital distribution platform operated by a MVPD, virtual MVPD or any other third party</u> (e.g., Xfinity OnDemand, Hulu, Netflix, HBOMax, Amazon Prime, Disney Plus, Apple Plus, YouTube), including without limitation, any Third-Party SVOD Platform."

Agreement §55(c) (emphasis added).

This definition includes two requirements.  To qualify as a "DCL Digital Platform," the service (i) must be a "direct-to-consumer service" operated by Discovery and (ii) "shall not include a third-party digital distribution platform operated by a MVPD, virtual MVPD or any other third party."  The first requirement is addressed here, and the second in the next section.

The term "direct-to-consumer" is the common terminology for a business model where businesses "market, sell, and ship products directly to consumers through their own ecommerce platforms," which allows the business "to maintain control over the customer experience,

15

pricing, and branding, while also building direct relationships with their customers."[5]  In a direct-to-consumer transaction, the business sets the price, bills the customer directly, receives direct payment from the customer and directly controls access to the goods or services.  *See id*. This contrasts with transactions where Discovery has a relationship with a third-party, which, in turn, has the direct relationship with the actual viewer/customer, who pays the third-party rather than Discovery.

This "direct to consumer" distinction is exactly what is at issue here.  As the Complaint alleges, "When a customer watches a video-on-demand episode of *Dirty Jobs* by directly accessing a Discovery platform (e.g., through the websites *discoveryplus.com* and *max.com* or *go.discovery.com*) and the customer is paying Discovery directly where there is a subscription fee, the consumer gets access directly from a platform owned and operated by Discovery without using a third-party Multiprogram Distributor [MVPD] and the fees paid by the consumer go directly from the consumer to Discovery rather than from the consumer to a third party, such as a Multiprogram Distributor."  (Complaint ¶67)

In such a case where a consumer buys a subscription to the *Max* or Discovery+ feature <u>directly</u> from Discovery, Discovery sets the price, bills the consumer directly, gets paid by the consumer, collects the subscription revenue and can turn access on and off.  This would be a

---

[5] Direct To Consumer (DTC or D2C) Meaning | Rebuy (accessed September 19, 2025); OxfordLearnersDictionaries.com (accessed September 19, 2025) ("direct-to-consumer": "used to describe a business method in which a company makes a product, sells it directly to customers over the internet and delivers it to them, rather than selling through shops or using other companies to distribute the product"); Direct-to-consumer - Wikipedia (accessed September 19, 2025) ("Direct-to-consumer (DTC or D2C) or business-to-consumer (B2C) is the business model of selling products directly to customers and thereby bypassing any third-party retailers, wholesalers, or middlemen"); What Is Direct-to-Consumer? Everything You Need To Know (2024) - Shopify (accessed September 19, 2025) ("Direct to consumer (DTC) is a retail model where brands sell directly to new customers"); Direct to Consumer (DTC) Definition - Glossary - CDP.com (accessed September 19, 2025) ("Direct to consumer is a sales strategy where manufacturers and CPG (consumer packaged goods) brands sell their products directly to their customers instead of selling them through retailers and wholesalers").

direct-to-consumer transaction between Discovery and the consumer.  In that case, "such an airing takes place on a DCL Digital Platform because it occurs on a 'direct-to-consumer service owned and operated by DCL'" (Complaint ¶68), and thus is covered by §17.

But if the consumer subscribes to an MVPD service (*e.g.* a subscription to Spectrum or DirecTV) which includes the *Max* feature, the third-party operator (not Discovery) has the consumer relationship.  The third-party MVPD operator sets the price, bills the consumer, collects the subscription revenue, and can turn access to the service on and off.  (Complaint ¶73) That is clearly *not* Discovery direct-to-consumer.  The MVPD is clearly the middleman not permitted in a direct-to-consumer relationship.

Discovery has no direct relationship and receives no payments from the consumer; instead, it receives a fee from the MVPD — the type of fee designed to be shared with Rowe under §22, a split of third-party licensing — and the "consumer is a direct customer of the third party, not Discovery."  (Complaint ¶72)  Accordingly, a video-on-demand airing accessed on a third-party video-on-demand platform through the third-party facility "is not provided through a 'direct-to-consumer service owned and operated by DCL [Discovery],'" and therefore is not covered by §17.  Complaint ¶71 (quoting Agreement §55(c)).

> **2.** **Because §17 expressly states it does "not include a third-party digital distribution platform," Discovery cannot read it to include such video-on-demand airings on third-party digital distribution platforms.**

As above, for an on-demand airing to be over a "DCL Digital Platform," §55(c) requires that the service "shall not include a third-party digital distribution platform operated by a MVPD, virtual MVPD or any other third party."

When a subscriber of an MVPD/virtual MVPD (as above, providers of traditional, linear multi-channel pre-scheduled programming) views a *Dirty Jobs* episode by going to the third-party's user interface, seeing the Discovery feature, and selecting a *Dirty Jobs* episode to view on-demand, the episode is streamed to the consumer from the third-party's video-on-demand platform over the third-party's equipment or with the third-party's assistance.  (Complaint ¶84)

For example, if a consumer — whose contract is with the third-party, not Discovery — goes to DirecTV's interface, selects the Discovery *Max* feature, and selects episode 120 of *Dirty Jobs*, the episode is streamed from DirecTV's video-on-demand platform to a DirecTV satellite and then back down to the DirecTV antennae at the consumer's home.  As the Complaint alleges, this is an episode DirecTV makes available to its subscription customers using Direct TV's video-on-demand service capabilities.  *Id*.

Thus, this video-on-demand service *includes* a third-party digital distribution platform operated by the MVPD/virtual MVPD.  It cannot be within the DCL Digital Platform definition because "a DCL Digital Platform shall not include a third-party digital distribution platform operated by a MVPD, virtual MVPD or any other third party."  (Agreement §55(c))  The contract language is plain and broadly stated, excluding from §17 any platform that *includes* a third-party platform operated by any third-party.  Such on-demand airings are excluded from §17.

*   *   *

In summary, the "DCL Digital Platform" definition includes two key, express requirements that exclude on-demand airings accessed through a Discovery feature on a video-on-demand platform operated by a third-party MVPD/virtual MVPD or other third-party.  First, such airings are delivered using a third-party's digital distribution platform and therefore fail to meet the §55(c) requirement that a qualifying service "shall not include a third-party digital distribution platform operated by a MVPD, virtual MVPD or any other third party."  And second, because the consumer is a subscriber of the third-party (not Discovery), which controls all aspects of payment and access, Discovery has no direct consumer relationship.  Thus, such airings are not, as §55(c) requires, through a "direct-to-consumer service owned and operated by DCL [Discovery]."  Therefore, on each of those two grounds, on-demand airings accessed through a Discovery feature on a video-on-demand platform operated by a third-party are not covered by §17, but rather, by §22.  Discovery is in breach for not treating them accordingly.

18

### 3.   All of Discovery's §17 arguments fail.

Discovery asserts a series of arguments attempting to apply §17 to third-party video-on-demand services that license access to a Discovery feature (e.g. Max or Discovery+) and make it available to consumers. Each argument ignores or misquotes the Agreement's language or Complaint's allegations.

Discovery asserts: "there is nothing in the Agreement or the definition of a DCL Digital Platform that requires a consumer to gain access to a Discovery app only through Discovery in order to qualify as a DCL Digital Platform." (Mot. at 11) But the definition of "DCL Digital Platform" *does* include express requirements for the distribution platform (it "shall not include a third-party digital distribution platform operated by a MVPD, virtual MVPD or any other third party"), and for the consumer relationship (it must be "direct-to-consumer service"). Agreement §55(c). Discovery ignores both requirements. That alone is fatal to its argument.

Discovery asserts three times that "Plaintiffs concede" or the "Complaint concedes" that "whether the consumer accesses the app through Discovery or through an MVPD offering, in the end the consumers are still accessing the Program on a DCL Digital Platform." Mot. at 10-11. The Complaint contains no such concession; the Complaint paragraphs Discovery cites state just the opposite. For example, "when a consumer watches a video-on-demand episode by accessing it through a Discovery app (such as Max) on a service provided by a third-party Multiprogram Distributor (such as Cox cable or DirecTV), the airing is not within the definition of DCL Digital Platform." *Id*. ¶70.

Discovery asserts: "as the Complaint notes, the actual viewing of the Program is taking place on the Discovery app." (Motion at 12) That is blatant mischaracterization. What the Complaint actually says is that a consumer watches such a "a video-on-demand episode by accessing it through a Discovery app (such as Max) *on a service provided by a third-party Multiprogram Distributor (such as Cox cable or DirecTV).*" (Complaint ¶70 (emphasis added)) As explained above, the actual viewing of the Program is accessed by a customer through the non-DCL third-party digital platform he or she subscribes to (*e.g.*, streaming from DirecTV's

19

video-on-demand platform up to a DirecTV satellite and down to the DirecTV antennae at the consumer's home).[6]  No part of this platform is owned and operated by Discovery — but, more importantly, such an airing of *Dirty Jobs*, at a minimum, clearly "include[s] a third-party digital distribution platform operated by a MVPD, virtual MVPD or any other third party," Agreement §55c, and as such, falls outside the scope of §17.

Moreover, were it the case that distribution of such on-demand airings in part included a component operated by Discovery and in part included a third-party digital distribution platform, it would still be excluded from the definition of a DCL Digital Platform.  Contrary to Discovery's implied premise, the Agreement does not read:  "DCL Digital Platform shall exclude a platform that *consists entirely of* a third-party digital distribution platform."  Instead, §55(c) reads:  "DCL Digital Platform shall not *include* a third-party digital distribution platform." (Emphasis added.)  Whenever a consumer accesses *Dirty Jobs* using a Discovery feature on a third-party digital distribution platform, the distribution *does* "include a third-party digital distribution platform," and the consumer has a contract with such third-party.  Therefore, such a video-on-demand airing is expressly excluded from the definition of DCL Digital Platform.

Discovery asserts:  "it does not matter that, should the consumer stop paying their cable bill, they may lose access to the Discovery apps," because that "does not change the fact that the viewing takes place on a Discovery app." (Motion at 12)  Both parts of this assertion are wrong. It very much matters that the third-party company controls access to the video-on-demand service, because if a third-party (not Discovery) controls billing, receipt of payment, and access to the video-on-demand service, it is not a Discovery direct-to-consumer service.  And it is false to say "the viewing takes place on a Discovery app," because in fact the viewing, at a minimum,

---

[6] For the same reasons, Discovery's baseless assertions that "[t]he underlying digital platform on which the Program resides remains at all times that of Discovery," and that "the platform on which the viewing is occurring is still one owned and operated by DCL," (Motion at 12), are false and impermissibly contradict the Complaint's factual allegations.

clearly "include[s]" the third-party's video-on-demand platform, and the customer has a contract for such access with the third-party.

Discovery asserts: Rowe's reading of the Agreement leads to absurd consequences because "a user needs an internet connection and web browser to facilitate access," and "the consumer accessing the episode on *discoveryplus.com* is first and foremost a customer of [the Internet provider] and no viewing would ever be on a DCL Digital Platform under §17 because an Internet provider supplying Wi-Fi or ethernet service ultimately controls whether the user can access *discoveryplus.com*." (Motion at 12) This argument fails, because, as demonstrated below, under §17, the presence of an Internet carrier in the distribution chain has no bearing on whether Discovery's *discoveryplus.com* platform (1) is a "direct-to-consumer service owned and operated by DCL," and (2) "does not include a third-party digital distribution platform."

*First*, an Internet provider's presence has no impact on the Discovery "direct-to-consumer" relationship. The service at issue is video-on-demand, and subscribers to Discovery's *discoveryplus.com* feature purchase the video-on-demand service from Discovery, not from the Internet provider. Likewise, the Internet provider can turn on Internet access, but only Discovery can turn on access to the *discoveryplus.com* video-on-demand service. By analogy, if Nike sells shoes through the Nike.com website, this is direct-to-consumer because Nike controls pricing, billing, payment receipt, and access to the shoes in Nike's warehouse. If instead the consumer bought the same pair of Nike shoes from Macy's, it is not direct-to-consumer. And for the direct-to-consumer purchase from Nike.com, it does not matter that UPS or Fed/Ex or the U.S. Postal Service is the carrier that delivers the shoes. Buying off of Nike.com would still be direct-to-consumer. For the same reason, the presence of an Internet carrier delivering Discovery's digital

feed to the consumer does not eliminate Discovery's direct-to-consumer relationship.[7]

*Second*, the requirement that a DCL Digital Platform "not include a third-party digital distribution platform" excludes the use of a third-party platform that *distributes content*; it does not exclude the use of an Internet provider.  Section 55(c) reads:  "shall not include a third-party digital distribution platform operated by a MVPD, virtual MVPD or any other third party (e.g., Xfinity OnDemand, Hulu, Netflix, HBOMax, Amazon Prime, Disney Plus, Apple Plus, YouTube)."  MVPD and virtual MVPD operators are content providers.  And the provision goes on to recite eight specific examples for clarification (Hulu, Netflix, YouTube, *etc.*), all of which are content platforms.  It would therefore be unreasonable to interpret "third party digital distribution platform" as encompassing an Internet carrier, *i.e.*, a service that is not a content platform.

And were there any doubt about the proper interpretation, the §55(c) definition of "DCL Digital Platform" expressly requires that it be an "Internet-delivered" service.  Thus, interpreting the requirement that a DCL Digital Platform "not include a third-party digital distribution platform" as "not include an Internet provider" would impermissibly create a direct conflict in the contract language.  That would be an absurd interpretation.

Accordingly, when a consumer subscribes directly to Discovery's Discovery+ and accesses it directly on the Internet, and then Discovery streams an episode of *Dirty Jobs* through the Internet to the consumer, the distribution does not include a third-party digital distribution platform, and this service would be within the definition of DCL Digital Platform.  No absurd consequences follow from applying the actual contract language.

---

[7] In fact, it is Discovery's argument that produces absurd consequences.  If the use of a third-party Internet carrier were sufficient to eliminate a direct-to-consumer relationship, then there would be no such thing as direct-to-consumer commerce over the Internet, when in fact, most direct-to-consumer commerce is conducted over the Internet.  The presence of the Internet provider is irrelevant because an Internet provider does not control any aspect of a direct-to-consumer relationship (pricing, billing, payment receipt, or access to the product).

**B.**     **Video-on-demand airings accessed through a Discovery feature on a third-party platform are governed by §22, and Discovery is in breach for failing to account to and pay Rowe accordingly.**

With (i) Discovery having conceded treating the video-on-demand airings at issue here under the §17, and (ii) Rowe having demonstrated (and certainly stated a claim) such §17 treatment is a breach (grossly underpaying Rowe for years), Plaintiffs reiterate the correct treatment is set out in §§22(e) and (k) (or (l), the catch-all backstop for which Rowe negotiated). Section 22(e) encompasses any airing on "subscription video on demand ('SVOD') platforms owned or operated by third parties ('Third Party SVOD Platforms')," and §(k) covers "video on demand platforms that license content through sharing of advertising revenue ('AVOD') owned or operated by third parties." These provisions unambiguously cover video-on-demand airings accessed using a third-party video-on-demand platform, whether subscription-based or advertising-supported. And §22(l), the catch-all, encompasses everything else. But at bottom, Discovery does not address §§22(k) or (l) at all with respect to this issue.

As the Complaint pleads, Discovery has failed to account to and pay Rowe and failed to negotiate with Rowe for revenues from licensing operators of MVPDs to provide video-on-demand airings of *Dirty Jobs* when third-party's digital distribution platforms licensed a Discovery feature (Max/Discovery+) for use by the third-party's customers, and is in violation of §22. (Complaint ¶¶87-103) The Complaint thus includes all elements of a properly pleaded breach.

**C.**     **Even if §17 were applicable to on-demand airings accessed through a Discovery feature on a third-party platform, Discovery would still be in breach of the Agreement, as it has failed to account for such airings.**

As a coda to this discussion, while Rowe has demonstrated above Discovery is in breach with respect to on-demand airings on third-party platforms, even if it were not and Discovery believed its own argument that these airings are covered by §17, Discovery would still be in breach for not accounting and paying under §17. Despite Rowe's efforts for two years to get Discovery to account for such airings under its interpretation, Discovery has stalled and not

23

accounted or paid.  As the Complaint alleges, "Even under Discovery Talent's interpretation, it has been unable to account to Lab Rat or properly pay Lab Rat for years."  (Complaint ¶27)

Discovery makes the assertion, with no relevance to the issues on a motion to dismiss: "Rather than work with Defendants to address any questions Rowe may have with the accounting … Plaintiffs have chosen to make a federal case, literally, out of their grievances." (Motion at 3)  Indeed, for what it is worth, this contention is false.  For over two years, Rowe repeatedly requested an accounting from Discovery for these airings.  Discovery repeatedly promised that an accounting would be forthcoming, stating that it was being reviewed by this person, or that person, or that they were getting the results from their "ingest model" (yet another Discovery fabrication).  When it became apparent that Discovery would never provide the promised accounting, federal litigation was a last, and necessary, resort.

Therefore, all other issues aside, the Complaint states a claim for breach of Discovery's obligations to account to Rowe and to pay Rowe for the airings and exploitation discussed here (Complaint ¶¶29, 94-95), and the motion should be denied.

## IV.    Because Rowe's interpretation of the Agreement is reasonable, the motion must be denied.

As set forth above, Rowe's interpretation is fully supported by the Agreement's language, while Discovery's interpretation is unreasonable.  But if the Court were to conclude both sides have presented reasonable interpretations, Discovery's motion should still be denied.  At worst for Rowe, there would be a need to resolve an ambiguity through extrinsic evidence and other contract interpretation devices not available on a motion to dismiss.

"To assess whether contractual language is ambiguous under New York law, courts in this Circuit examine whether the language 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person.'"  *Chambers v. HSBC Bank USA, N.A.,* 2020 WL 7261155 at *3 (S.D.N.Y. Dec. 10, 2020) (quoting *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks omitted)).  "If a material contractual term is ambiguous … dismissal is inappropriate because all contractual

24

ambiguities must be resolved in favor of the plaintiff at this stage." *Chambers*, 2020 WL 7261155 at *3. "Where reasonable minds could be said to differ because the language the parties used in their written contract is susceptible to more than one meaning—each as reasonable as the other—and where extrinsic evidence of the parties' actual intent exists, it should be submitted to the trier of fact." *Consarc Corp. v. Marine Midland Bank*, 996 F.2d 568, 573-74 (2d Cir. 1993).

At the very least, Rowe's interpretation is a reasonable one. Thus, if the Court were to conclude Discovery's interpretation of the operable contract language is also reasonable, the language would be ambiguous. "Any contractual ambiguities must be resolved in the plaintiff's favor." *Perks v. TD Bank, N.A.*, 444 F. Supp. 3d 635, 639-40 (S.D.N.Y. 2020). "Because Plaintiffs' proposed construction is a reasonable construction of the Agreement, Plaintiffs have sufficiently alleged a breach." *Id*. at 640.

While Rowe maintains for the reasons discussed above the Agreement unambiguously supports his claims, it is represented to the Court that if any ambiguity were perceived, the Agreement's drafting and negotiation history, especially when understood in the light of the parties' earlier agreements on the same issues governing their relationship until 2020, would resolve any ambiguity in Rowe's favor beyond question.

## V.    Discovery breached the Agreement by failing to account for all linear airings governed by Agreement §16.

The third category of breach is that Discovery has failed to account for all linear airings, as required by §16. In particular, Discovery "failed to account for linear airings on any Virtual Multiprogram Distributor" (Complaint ¶31) — *viz*., an Internet-based linear multichannel provider.

Discovery does not deny it has this contract duty but only claims the Complaint "lacks any factual detail beyond conclusory allegations to make any such claim plausible." (Motion at 14) This argument fails.

The Complaint alleges §16 includes linear broadcasts of *Dirty Jobs* by "virtual MVPDs." (Complaint ¶53 (quoting Agreement §16)) The Complaint alleges Discovery "failed to account

25

for linear airings on any Virtual Multiprogram Distributor." Complaint ¶63. The Complaint identifies examples of virtual MVPDs implicated — YouTube TV and Hulu + Live. (Complaint ¶¶28, 50) The Complaint further alleges Discovery's accounting was deficient because "the ratings service used by Discovery Talent does not measure linear exploitation" from such virtual MVPDs, and therefore the minutes viewed from such airings were never included in Discovery's accounting. (Complaint ¶63)

These allegations are all plausible on their face, and Discovery's motion fails to identify any aspect of them that is implausible. Moreover, the Complaint clearly puts Discovery on notice this allegation applies to all virtual MVPD linear airings, because Discovery has "failed to account for linear airings on *any* Virtual Multiprogram Distributor." (Complaint ¶63 (emphasis added)) Accordingly, Rowe's allegations are sufficient at the motion to dismiss stage.

Rowe is not required to plead additional detail at all, but especially so where, as here, that detail is within the exclusive control of Discovery.[8] When defendants "are in exclusive possession of information and documentation relevant to their operations" and, therefore, the "facts are peculiarly within the possession and control of the defendant," a plaintiff is not required to plead such facts with any greater specificity than what Rowe has alleged. *New York v. Town of Clarkstown*, 95 F. Supp. 3d 660, 681 (S.D.N.Y. 2015) (internal quotes omitted).

Having identified specifically two of the largest virtual MVPDs in the industry, YouTube TV and Hulu + Live, and having alleged specific deficiencies in Discovery's accounting and ratings service that are inherently unable to measure minutes of linear exploitation, as required under §16, Rowe has adequately alleged breach of §16.

---

[8] Rowe could amend to identify additional vMPVDs at issue, but Rowe does not have access to all license agreements Discovery has with vMPVDs. Rowe does not have access to specifics of ratings data Discovery collects on *Dirty Jobs* airings, so as to audit and allege even more specifically deficiencies in Discovery's performance. But what is alleged is enough.

26

## VI.     DCL is in breach of the Guarantee.

The Complaint pleads that Discovery Communications LLC (DCL) "unconditionally guaranteed to Lab Rat and Rowe the obligations of Discovery Talent under the Agreement." Complaint ¶104-15.  Discovery makes only a one-sentence argument that this claim fails because there is no breach.   As demonstrated above, there has been breach alleged (and in fact), and Discovery's motion as to the Guarantee also fails.

Dated:  September 19, 2025
           New York, New York

                                                                SCAROLA ZUBATOV SCHAFFZIN PLLC


                                                                By _____/s/ Richard J.J. Scarola_____
                                                                            Richard J.J. Scarola
                                                                            Alexander Zubatov
                                                                *Attorneys for Plaintiffs*
                                                                620 Fifth Avenue, 2nd Fl.
                                                                New York, NY  10020
                                                                Tel.:  (212) 757-0007

27

## CERTIFICATION PURSUANT TO S.D.N.Y. L.R. 7.1(c)

I, Richard J.J. Scarola, an attorney duly admitted to practice law before the courts of the State of New York, hereby certify that this Memorandum of Law complies with the word count limit set forth in S.D.N.Y. Local Rule 7.1(c), because it contains 8,730 words, excluding the parts exempted by the rule.  In preparing this certification, I have relied on the word count of the word-processing system used to prepare this Memorandum of Law.

Dated:  September 19, 2025
       New York, New York

                                        _____/s/ Richard J.J. Scarola_____
                                             Richard J.J. Scarola